Ms. Miller, when you're ready. Good morning, your honors, and may it please the court. Monica Miller for the appellants. The Establishment Clause forbids the government from requiring religious objectors to be present to avoid a religious practice at a school-sponsored ceremony. But if the two religious practices in this case persist, religious minorities will continue to face the unconstitutional choice between attending their school's most significant event, their graduation, and forgoing it entirely. I intend to discuss today two reasons why this court should reverse the judgment of the District Court and, of course, address any standing issues that you may have. The first is that the prayer practice remains unconstitutional because it continues to lack a secular purpose, and the unavoidable effect of a prayer that's delivered to a captive audience of schoolchildren at a school event is to coerce dissenters into participating in the prayer. It would help me, because there's a lot going on in this case, if you would say this is what I'm talking about. Okay. So what you're getting ready to tell us, I take it, is that the post-2013 prayer policy remains unconstitutional. That's correct, Your Honor. Okay. Sorry, thank you. We maintain that the practice is the same practice. Let me say, and you think that the practice, is the practice different now in the text than it was before? Your Honor, there is no facial policy. It's all we've had is a practice and then a letter. Just let me ask, though. So I understand, too. Yes, yes. As to the new school policy on prayer or student speech, that is, are you making a facial challenge to that? No, Your Honor. Just as applied? That's correct, because there is no actual facial policy. When we use the term policy, we're just talking in terms of the Monell policy, a practice, a custom. No, no, no, no, no, no. You said there's no facial policy. That's correct. There is a facial policy. There's a text. The rules of schools follows now. Your Honor, there are four affidavits that were submitted by principals stating what they will not do, at least for the graduation ceremonies that have now since passed. But there was also a letter that the district wrote in 2013 in response to the AHA's letter stating in clear terms that it will not prohibit prayer or religious message at school-sponsored events, including graduation. And the district court interpreted that. When I'm trying to decide, though, because I read some writing, I thought it was a new school's position. I thought the school conceded that their old position was incorrect. And they have a new position. And you challenge that new position because of the way it's been stated by the school district or the way that it has or will be applied by the school district? Actually, both, Your Honor. Okay. Well, that's different than what you just said. Okay. What I'm trying to say is that the new policy— Well, that explains why I can't understand it. Okay. I don't think you quite understand what your argument is. Oh, I do, Your Honor. The policy—the plaintiffs have always challenged the practice of including the prayers in the ceremony themselves. I understand it, but you challenged a policy that was in effect at the time you filed your lawsuit. Right. It's my understanding that the school changed that—the school district changed that policy in response to your lawsuit. We challenged that premise in the sense that we—the policy that's been changed is only reflected in four principal's affidavits, which is not really a formal policy. I'm sorry. I'm not sure what we're talking about. Okay. Is there a question that, at least going forward, that, as I understand it—and you correct me where I'm wrong, or tell me what it is, because we have to know what it is you're saying is unconstitutional. Okay. So, as I understand it, this—instead of selecting—the school is selecting—is going to select a student through neutral criteria that—and allowing the student to say just about anything as long as it's not disruptive, as long as it doesn't incite— I mean, as long as it's not in some way disruptive. That's their statement of what they're contending the policy is. And what's your statement of what they're contending? I don't understand. Yes. We have to have some common ground that we're talking about. Right. So, if you don't think that's the policy, what do you articulate the policy to be? Of permitting prayers to be delivered at a graduation ceremony. No, you have to give me a little more than that. Okay. Because nowhere is it—is that written anywhere? Actually, Your Honor, it is written in the school district's letter, which was relied upon by the district court in— Going forward? Yes, that's correct. So, you're saying that what they're articulating, what we are—what I was operating on the assumption was the policy, is not, in fact, the policy? It's the policy of four principals stating that they will no longer review the programs—or, sorry, review the prayers beforehand or print the prayers on the program, but everything else has remained the same with respect to the fact that prayers are permitted to be delivered. They won't be printed, you know, on your graduation program. Instead of invocation, it will say welcome or closing instead of invocation and benediction. So, the school is not going to choose a student based on rank or whatever? They contend that they will, at least at the four schools where affidavits are submitted. And allow that student to make an address of that student's choosing. You're saying that that's not going to happen? Well, that's what they contend, and what we challenge is the aspect of that with respect to permitting a prayer. And what you're saying—because what I think the problem is, is you're saying that that doesn't necessarily, on its face, forbid prayer. Is that the distinction? It doesn't. That's correct, but also because the district said it will not. Excuse me, but you're not disagreeing with me, then, that the school is going to select a student based on criteria and allow the student to say something that the school does not control the content of? As I understand it, you're saying that the school is not prohibiting that student from including within that message something that you may find offensive as too closely resembling a prayer. Is that the distinction? I want to say yes, but there are some nuances in what you said that I really want to point out, which is that, again, the district said it will permit prayer and religious messages. The district said that it will allow the student to say what the student wants to say, subject to some criteria that prohibit disruption. They're not—the student, the school, is not proscribing the subject. It's not prohibiting—there's no prohibition of anything other than disruptive speech, but it's not proscribing the subject. So it's hands-off, it's what the student chooses to say, subject only to the criterion that it not be disruptive. Is that fair? Is that accurate? Well, again, I would challenge the fact that the students wouldn't interpret this to mean prayer. I don't care. I'm not the slightest bit interested in that. I'm interested in whether or not I have articulated what the school says it is doing. I'm not focusing at all on how the student interpreted it or what the school student chooses to do with it. I believe that's correct, that that's the interpretation that the district court— And so then your argument against what we think is the new policy is that it does not prohibit school prayer, which you think it must do. That's correct, and I think when you consider the purpose test of the lemon prong, you have to— If you could, for purposes of my question, if you could just stay with what we've agreed so we're on the same page. Okay. And that's—your argument is that it does not facially prohibit prayer. The word facial is challenging because there's no facial policy. It doesn't prohibit prayer. It doesn't prohibit prayer, that's correct. And you think it should. We— No, either. Do you think it should? Policy or no policy, we're seeking to enjoin prayer at the graduation. So if they have a policy— No, no, no, no, that's it. Really, we're just trying to understand what you're going to argue so we can then follow that. But you say to the extent there is a written policy embedded in letters or whatever, that there's a problem with whatever those words are that the school would point to the school district because that does not prohibit prayers or religious comments. Right. And when we look at the letter as the source of the policy, which is what the district court did, it is not hands-off in the sense of it specifically uses the language prayer and religious messaging, which is distinct from Adler, which is the case that the district relies upon and the district court relies upon, where there was no suggestion whatsoever of what the contents of the speech would include. I don't understand that—I don't understand what you were presenting to me in that last bit. Okay. The district court relied upon an outlier case, Adler v. Duval County School District, where the 11th Circuit, which, again, is an outlier among— In what context did it rely on it? The district court? What did you just say? I thought you said the district court relied on— On the Adler case. Yes, and my question is in terms of the policy itself. Yes. Yes, the Adler policy itself did not use the word prayer or religious message in the actual face of the policy. And when we're looking—if we're trying to compare facial policies, again, this isn't a facial challenge. Adler was limited to a facial challenge, and that's why the 11th Circuit upheld it, because—and it refused, actually, to do an as-applied analysis. But this is not a—to the extent there is a—honestly, we're not arguing with you.  Yes, oh, I understand. So to the extent there is a written policy, to the extent there is one, whatever these letters communicate or the school board has said, whatever that is, you don't facially challenge that. No, we don't. So it's—but I just thought you said you did because it didn't prohibit prayers. We challenge the district's position. Perhaps that's a better way of putting this, is the district's position of allowing prayer. Congratulations. No, I think the letter said that the district will not prohibit. If a student delivers a prayer or provides a religious message, they won't prohibit it, as long as it's not disruptive. That's right. And so they're permitting it. I mean, by not prohibiting it, they are allowing it. They are allowing it. Ms. Miller? Yes. Oh, excuse me. I'm sorry. No, please. Ms. Miller, I have a question about the American Humanist standing in this case at the time of this appeal. Okay. The does have moved. Yes. You are left challenging the prayer. What evidence do we have of any members of the American Humanist Association who are affected? It seems to me that there might be a problem similar to the problem that the Supreme Court talked about in Summers v. Earth Island, that you haven't demonstrated at this time. Okay. I guess that's more of the problem with regard to the chapel. The chapel policy. Right. The chapel policy. Okay. So with the prayer policy, I think it's undisputed that the AHA does have the members for standing to challenge the prayer practice because under Piedmont and, you know, this Court's jurisprudence that it is. And what about the chapel policy? The chapel policy is difficult to explain this in the short amount of time that I have, but. Well, you better try. I will. You're right. So for one, the does do have standing for the nominal damage claim because that was not moot and it was sufficiently pled in the complaint and the Court inappropriately dismissed it as moot even though they made a clear claim for it both in the complaint and in their summary judgment memorandum. And the question is with respect to the American Humanist Association. Okay. So. On the chapel policy. That's right. So at the time that the does moved within the district, which was before judgment we conceded, AHA did not pursue other members before judgment because it relied on a material misstatement of fact made in the defendant's interrogatory sworn in 2014 that said that Mountain View Elementary School was the only middle and elementary school within the entire district to use an off-site venue for its graduation ceremony. So AHA did not pursue other members at that time because it assumed the Doe family was the only family within the district that would have had standing. After appeal, when we approached our members about the prayer practice, we discovered that this wasn't in fact true, that other schools had been using religious venues, including Bell's Crossing Elementary, Brasher High School, and Brushy Creek. Okay. Is this in the record? This is in the record, Your Honor. And actually the district reaffirmed this in a verification on JA 376. What is this that's in the record? Everything you just said is in the record? The interrogatory in which the defendant. Well, the interrogatory is in the record. But all the rest of that stuff that you add. Oh, with respect to the other practices, no, sorry, I misunderstood the question. Those are not in the record. Those affidavits testifying to the other venues are in the appeal motion to dismiss response within the affidavits that were submitted with the AHA members. Okay, so with regard to the future chapel policy, what do we have in the record to establish standing on the part of the AHA? That's what I'm having trouble with. Right, Your Honor. And I can see that in the record there isn't, because AHA did not pursue its other members at the time prior to judgment. At the time of judgment, right. Because we did not believe that we had other members because we were under the oppression. But for purposes of standing, if you didn't establish standing at the time of judgment, isn't that a problem that has to be addressed in the lower court? Well, I believe because the lower court was operating under the assumption that Mountain View Elementary was that always. But we don't know, I don't know what the lower, what assumption the lower court was operating on the basis of. What gives a standing on that claim? Not the prayer policy, but the chapel policy. Right. So the court should look at the fact that AHA was relying on a material misstatement when it didn't pursue other members for standing. And I think the AHA should be entitled to further fact-finding on that issue because of the misstatement. Had AHA known that other schools were using religious venues, Baptist venues, it would have looked for other members before judgment. But what do we do with this? We're asking that the court remand the chapel policy injunction claim for further fact-finding in order to determine, or at least allow discovery on the limited issue of the other venues due to the fact that it appears to be incorrect that Mountain View is the only school to use. Right. But if at the time of the judgment in the district court you did not have members who were affected by the chapel policy, then under the Summers case, you wouldn't have any basis for a remand. You would lose as to the chapel policy, wouldn't you? You know, in Summers there wasn't a misstatement. The organization You just say the answer would be yes normally, but in this case you were misled by the other side. Is that your position? That is my position, yes. If I may conclude briefly. First of all, let me say, I don't know about briefly. First of all, Judge Keenan, do you want to follow up any more on that about the Summers issue on the chapel policy? No. I kind of would. Is there what in Summers suggests to you the availability of the option that you're articulating or the exception that you're articulating? I think it goes back to this court's de novo review of the record, and if there's a misstatement or what I was asking. Within the Summers case? Yes. You know, to be honest, I don't think Summers is silent on the issue of whether there is a misstatement of that. Okay. Yes. I want to ask this question, and then I'm going to ask the other side a lot like it. Your claim as to whatever the school's policy is going forward, did the school change its policy in this case in your mind? Slightly. So the answer would be yes. Okay. No, I'm asking you. I thought they conceded error on what they had been doing and said going forward they will do things differently. Isn't that what the school did? Going forward they didn't do things differently. There is at least evidence of that. I said at least they assert that. That's correct. And then what they have now asserted to be their policy is we piece it together from the record. You don't challenge that. Do you challenge that on its face in saying looking at what their policy is, that is a problem because there's a facial challenge or not? Not. Our primary challenge is that. Not primary. Any facial challenge, yes or no? And if it's no, is it? Which is it? It's not a facial challenge. Okay, then. And it is an as-applied challenge? That's right. And you have evidence of as applied in this record the new policy, what I'm calling the new policy, is unconstitutional? We do have evidence of that. And what is that evidence? There's been several prayers that have been delivered since in 2014 and 2015 graduation. And so your evidence then is any prayer makes a policy unconstitutional? The fact that a prayer was given, your view is, makes any school policy or this school policy unconstitutional? Not necessarily. No, we also argue that the purpose prong of LEMON is violated independent of the possible applications of the policy itself. And we submit that the changes, the minor modifications that were made, were designed solely, as the district court said, as availing itself of a slight remaining loophole of religious demonstration. And the LEMON test doesn't permit such a. . . And your view is that it doesn't make any difference whatsoever if the school has any control over the selection of the topic? It doesn't because the school's. . . I'm just asking. It's your position that it doesn't make any difference? Constitutionally, no. Thank you. You have reserved some time. Thank you very much. Thank you. We'll call you back up. Mr. Barlow. Please, the Court. Tom Barlow, and with me is Doug Webb, who's General Counsel for the Greenville County Schools. I want to address the standing issues first. It's our position that there isn't standing in this Court of Appeals for either the chapel policy or the student messages claim. The only standing that American Humanist had was through the does. They did not submit at the district court level any other affidavits, declarations of any other members of AHA. It's much like the Moss v. Spartanburg case where the standing of the organization or the association was directly dependent. . . Under these facts, though, couldn't we assume standing? I'm not clear on which facts. You can assume standing based on those affidavits. Assume standing as to the speech, prayer policy, say. On the late-filed affidavits? Yes. Did we contend with the late-filed affidavits? Yes, those affidavits. Or any other affidavits on standing? Probably just the does affidavits would be the only others on standing. All right. So you know what I'm talking about. Yes, sir. Yes, Your Honor. And your answer to my question is? No. I don't believe you can assume standing. Certainly not for the Turner Chapel claim, Your Honor, because none of those affidavits. . . That's why I said about the school prayer speech. I call it prayer. Some call it speech. That. I think if you assume they're timely filed, I think they still don't. Okay. So we assume. But what's the problem with us assuming standing to get to the merits there? Because I believe under the Hunt v. Washington State Apple Advertising Commission case, Your Honor, association has to be able to prove that it otherwise had standing to sue in its own right the interest it seeks to protect or germane to their organization's purpose and neither the claim asserted, which they leave out of their brief. If we assume it, how do you defend the policy, the school prayer policy? And is there a school policy? And where is it? What is it? I think it's a matter of semantics whether it's a position, a practice, or a policy. Why don't I ask you that? Is there a school policy? You represent the school, don't you? I do. Do they have a policy? They have. What is the policy based on this record? They have a policy, and based on this record, the policy is to allow students who are selected upon neutral secular criteria to give a message of their own choosing at a public event such as a graduation and awards program. Is that similar to what their policy was at the start of this lawsuit? It's similar, but the policy was not of the same. Is it the same policy? It has changed in its enforcement. I don't know about all that. I thought you conceded error. We did concede error, Your Honor. Then if you concede error, if there's not a difference between the old policy and this policy, you lose on the merits. So what is – I'm asking you, there was an old policy and a new policy? Does that question make sense to you? It makes sense to me, Your Honor. Okay. Well, help us with it. Right. The actual event that happened, the 2013 awards program at the Turner Chapel, Your Honor, violated the Establishment Clause because it had invocation, it had benediction on the program, and that's our concession in that case. All right. Now, since then, the district has clarified its position, its policy, that it does – neutral secular criteria. Is there a written school district policy on student speeches? There is not. Okay. So you have to put it together from communications and responses to inquiries from the humanist society? Is that what you have to do? That's correct. You take it from the affidavits that we submitted? And so that being the case, so you concede that what at least – although the policy may have not changed, the application of the policy as it was in 2013, that was violative of the law. Because of that, the benediction and all those formal things that were endorsed are done by the – at the behest of the school, basically. That's correct, Your Honor. Okay. And so you say the policy you have now, with some talking to some lawyers and getting clarified they shouldn't be doing that, that is going forward, that's what we sort of call the new policy. That's right. Do you understand that that has been facially challenged in this case? Or is it an as-applied challenge? I think it's been challenged both ways, Your Honor. I think they've made a facial challenge that, as counsel said, the fact that it doesn't – As counsel said, it wasn't a facial challenge. Well, I think they said in their brief – Correct. I think that that's the facial challenge. The as-applied challenge is that despite what the school district is saying, it's resulting in prayers, which would be normal because the district allows students to give a message of their choice. All right? It has to be a facial challenge because it's challenged as long as – because it does not on its face prohibit prayer. I agree with that. That's what, in our view, makes it a facial challenge, the fact that it doesn't prohibit prayer. And the as-applied, you think, is as-applied since your policy has been clarified or refurbished or whatever the word is? That's my understanding of the argument as to the as-applied challenge. How much evidence is there since that clarification? Well, Your Honor – One graduation's worth in this record? We – actually plaintiff's counsel submitted some discovery responses, responses to requests for admissions, and they sampled 2012, 2013, and 2014 graduations and end-of-year programs. When did you change the policy? I'm using that generically. Sure. Clarify. When did you do that? That would have been in the summer of 2013. Do you take my point that as-applied as to the clarified policy would have to go from 2013 forward, wouldn't it? Correct. And how much information is there on that? In other words, how much as-applied evidence is there on the new and improved policy? As-applied, I think there is one school where the principal didn't get the message and put invocation benediction on the program again, East North Street in 2014. All right? In addition to that, two – Did the school do something about that when they found out? Yes. An affidavit of her supervisor is that she cautioned her that that's not appropriate. You can't do that. Going forward. Going forward, right. Okay. And in addition, two high school students approached their message that they're allowed to give the welcome or closing from a religious perspective and said a prayer during that particular time. So that's as-applied. That's all the religious speech that has happened since the clarification of the policy that's in the record. All right? So we think that the policy that she is advocating for would be viewpoint discrimination. The Child Evangelism Fellowship cases, Good News v. Milford, Rosenberger case, those all say that if you open a forum or if you allow people to speak on a certain topic, you can't exclude religion as the only topic that people are not allowed to talk on. If you have to accommodate religion, the Establishment Clause not only prohibits you from endorsing or establishing religion, it prohibits hostility towards religion. And we think that the American Humanist Association is advocating that, basically, that the court take a position that's hostile to religion. What do we do since there's no abrupt change in policy? Often school districts will have this is the old policy, this is the new written-out policy, and the school board votes on it, show of hands, record vote, this is the new policy. It's sort of a transition to a new application or clarification of the older language. Is that fair? I think that's fair. I think that's fair. How do we then look at what happens under the new and improved in light of what happened under the old? There was school entanglement under the old policy, as you can see. What do we do with going forward since there has at least been an evidence of entanglement, at least once you said, and we've had some students supposedly on their own, and we don't know otherwise, offer some religious, did they pray? Is that what they did? They said a prayer. Okay, so they prayed. How do we separate that from what is the longstanding tradition of the school district to allow school prayer? Well, I think you have to rely on the school district's good faith in complying with what it's done and the possibility that people who are offended by things going forward have the opportunity to file a motion for an injunction or seek relief. The district court's order says that it is operative against these sort of things. So to that extent, I think the district court... So your argument is, if I understand it, as to a facial challenge, you are not required to prohibit religious speech because you think that would be viewpoint discrimination. You don't list what all you'll allow. You just say, other than disruptive speech, you kids say what you want to say, basically. That's right. And you say, as applied, there isn't any evidence in the record on this new and improved policy that it runs afoul of anything other than the absolute prohibition on prayers, which you say is not proper. And so if it turns out the new policy as applied causes problems, somebody can challenge it then. Sure, then you would come back to court. If religion is dominating the new... I didn't say what you would use. It's just if somebody thinks, under the evidence as you go forward, that makes a case, they could then challenge the new policy then. Yes, that's right, Your Honor. And I think the evidence of record would show that, based on the change, religion is not the dominant focus of what these messages are, distinguishing from some of the other cases that the plaintiffs rely on. A lot of those cases, there's a vote up or down, have a prayer or not have a prayer. That's not what this policy is at all. It's not communicated to the students, oh, you can give a prayer, you can do this, or you can say this, or these are the things that you're allowed to say. It's basically we're picking you on neutral secular criteria. Isn't your view that school prayers are allowed, even student-led school prayers are allowed in reality now? I'm talking under the law. I think they are allowed under the law. If the school district allows other speech, you have to allow religious speech. I think that would be viewpoint discrimination under this Court's prior child evangelism fellowship cases, as well as the Supreme Court precedent that continues to focus on the viewpoint discrimination aspect of these cases, that religious speech would have to be allowed as well. So if we got past the standing issues, you would say, how should this case be resolved? What's your argument now? Maybe other judges want to talk to you about standing. But for me, tell me, if there is standing, so the issues are in front of us, what would you have us do first on the prayer-slash-speech issue, and then I want to talk to you about the misrepresentation or misinformation on the chapel policy. Make your argument for me. The argument on the speech, Your Honor, is that it passes the Lemon v. Kurtzman test. There is a secular purpose for allowing students who want to give a message of their own choosing, who are deservedly so based on secular, neutral criteria such as class rank, perfect attendance, good citizenship, things like that, those students should be allowed to give a message of their own choosing. That's a secular purpose. Let me add a personal edit here. I don't really understand why kids get rewarded for perfect attendance because there's no child I've ever heard of who hadn't been sick at some point in 12 years of school, and all they do is go to school and infect their college. But it seems to be a big deal, perfect attendance. But I know it shows determination, but at any rate, that's just a personal comment. Certainly, but we think that's a secular purpose. It passes the second prong of the Lemon test because it doesn't work in endorsement of religion. It doesn't advance religion if you allow children to speak on whatever topic they want to. It doesn't advance religion more than it advances any other particular topic that people talk about or want to talk about. If it turned out to be the case that in every instance where the policy, as it's now articulated, applied, resulted in religious speech, wouldn't that give rise to some questions about whether or not there might be some encouragement on the part of the school with respect to the selection of the topic? I think that would be problematic. If every student were praying or approaching it from a religious angle, then I think you have more of a problem with the second prong of Lemon where you're advancing religion. But as we've said before, there's none of that in the record in this case. Actually, it would be to the contrary that religion is a minor focus of these forums, that the students really aren't taking the opportunity to pray much or do religious speech. And as far as the entanglement prong of the Lemon test, the third prong, these speeches that the students are given are not reviewed by faculty. They're not reviewed before they're given, which may open up some other concerns at some point. Seems very risky to me. How does that allow you to address the disruption potential? Well, I think under Tinker, the seminal First Amendment case, that children don't lose their rights. I'm just asking if you don't know what they're going to say in advance, how do you just open a trap door and they just disappear? That's a good idea, I think. What do you do? How do you control for that? Well, I think if it amounts to a substantial disruption or a material disruption, you have to deal with it after the fact. I don't know that. Otherwise, I think you risk entanglement if you're doing it on the front end. I think that that creates problems more for you if you're going to do that on the front end. But you just still think, though, that would still be subject to and as applied challenge to what happened? Sure. That if you stop somebody or punish somebody, that would just be walked out in a hearing something like this as to if it was proper, what the court did and what the person said. Right. I think that on the record before the district court, there was no basis for the district court to have a permanent injunction against something that there was no evidence that it was even happening. Were letters sent to all school principals setting out this reengineering of the policy? How was that information communicated? There are not letters, so to speak, in the record of this. But I guess I can inform the court that legal counsel, general counsel, informed and met with all principals and has had communications with all principals, multiple communications about even going back prior to 2013 about what's appropriate and what's not appropriate. Well, well, well, you think that helps your case then? You tell them before and they still did what you conceded wrong. I think after the fact, the evidence has shown that they've gotten the message this time. I think that would be the response to that. What about the bad faith misrepresentation to justify no evidence of the association standing as to the chapel policy? I take serious exception to the idea that we engaged in bad faith in the discovery process. I know I suspect you did, but what about the information? How is that set up? I don't exactly know. One of the things that they submitted in response to the motion to dismiss the appeal was related to a charter school that is not even one of the school district schools. You know, South Carolina has a Charter School Act, and those are independent bodies that are not governed by the school district. The school district doesn't control those by policy or otherwise. So basically, you know, you've got them trying to rely on a school that isn't even the school district school, you know, having an invocation and a benediction. That may be a problem for that particular charter school, but, you know, you can't tag the school district with that. In addition, you know, What is she pointing to? She's pointing to, I think, the fact that another elementary school in 2014 and 2015 that she supplemented or submitted. I know, but she's pointing to an interrogatory answer, I thought, where the school district said basically she suggests only at this school do we do it, Mountain View or whatever. That's right. I think the interrogatory was do any other elementary schools use religious facilities for anything? For graduations, I think that was it. And y'all said no? We said Mountain View only. At the time, we weren't aware that another school had done it. Okay, so she's saying, well, there's a misrepresentation. Let's just say it's misinformation. Right. What do we do about that with standing? She said that answer from you prevented her from the need to or having to establish any standing. I don't recall any of the affidavits submitted with the response to the appeal that dealt with that particular school, though, with the school that went to the that used another religious facility. And certainly there's no affidavit, subsequent late affidavit testimony, that any of the students or parents had ever been to anything at the Turner Chapel, which is what we were operating on. That's where the Doe children went to school. And we thought part of our position in the whole case was these children went to one school. They were in a line of schools that would be middle school, high school, Blue Ridge Middle School, Blue Ridge High School. Theater school. Theater schools, correct. And this is a 70-something thousand student school district with 100-plus schools. And part of the issue with discovery was we don't believe all these other schools are particularly relevant for injunctive relief because the Does didn't go to those schools and cannot forecast that they're going to those particular schools. So there wasn't standing really to challenge that, because injunction standing requires a particularized injury that's imminent and something that's about to happen. It's not the case where somebody who is now in Alabama would have any standing to challenge what's going on in Greenville County schools. And finally, just sort of to wrap up with the Turner Chapel claim, we think the Turner Chapel is fully distinguishable. It's not a religiously-dominated facility. It's on the campus of a religious university, North Greenville University up there. It's more like a college auditorium than a church, and I don't think that the fact that there are a few religious symbols in there sends a message to the public of an endorsement of religion if you're using it once a year for a facility like that. Judge Keenan, do you have anything else? No, thank you. I want to ask one further question. It's just a broader question, and it won't take much of a response, but just if you have a response. What do you do when you have a—we talked about if the school had a neutral policy, just accept it hypothetically, we have a neutral policy, but over time, children gave—a lot of children said prayers or thanked God or whatever that I made it through or for my family and great teachers and all that. What do you propose you would do? And you said that would be problematic. I take that to mean that that then might be evidence of some school sponsorship or involvement. But, you know, listen, Greenville County, South Carolina, a lot of religious people, I mean very religious people, as you know, live in that district. And some of those schools, those kids just don't go to school for 12 years. They go to church for 12 years too. And so that is as much as who they are as education. And this is maybe what they naturally do based on their teaching. And it seems to me that the whole doctrine the Supreme Court has and how courts like us have to look at it might be loggerhead at some point because that's just maybe what some children, especially in Greenville County, as you know, that's how they live. And they would no more get up and probably it would be odd for them to get up and make a statement and not at some—I think they would feel amiss if at some point they didn't thank their Lord and Savior. I'm not—listen to me. From my position, I'm not proposing that. But it just seems to me that's the culture and the schools side by side and it intersects there and it's hard to separate the two. Do you see that problem? Well, I think the mere fact that students are—you just have to look at it by degree. I mean if every student that ever got up in a particular school did it, that would be one thing. But if it's six out of ten and in a particular rural area of Greenville County— some areas of Greenville County might be ten out of ten. Sure. Some of those smaller schools. And I think what you have to do is go back and make sure that the teachers and faculty— You think you would then just be forced to, you know, see if there's school involvement. You have to look at what the audience perceives too, I guess, as well as what they think of school. Sure. Okay. All right, thank you very much. Thank you, Your Honor. Thank you. Ms. Miller? We sort of tried to state what we thought your argument was to have them respond, and you can certainly say if we got it wrong. What I would like to address is the fact that the district, like the district court, ignored the coercion test in explaining what's problematic about this. If it's one prayer or five prayers, a prayer at a graduation ceremony isn't constitutional because it coerces dissenters. And my opposing counsel raises the CEF case, the Child Evangelism Fellowship case. In that case, this court took pains to distinguish Lee, Mellon, and Santa Fe from the flyer forum that was creating that case, noting that students would not be forced to listen to a religious message, nor would they be bound to sit by while other students prayed. And that was a very key factor in that CEF case. And that's exactly what this does. Even if it's just one graduation ceremony where the students, and we're talking about five prayers. Let me say this. Yes. Your argument is grounded in your belief that any prayer at a school function is unconstitutional. No, because the presumption is that, but I do agree with the Norfolk Eighth Circuit case where the school completely disentangled itself from the prayer that was the rogue board member. How would the school more disentangle itself from the prayer under this policy than it says it will? If you look at the Norfolk case, I think you get your answer because in that case. Well, we're asking you, and we're asking you pretty concretely because from what I've read, it seems as though the school is saying, and you don't seem to be challenging, that it has said we're taking a hands-off of the topic. Two things to that. In Norfolk, the school district had a policy that said there will be no prayers delivered. Right. And at the beginning of the ceremony, it was announced to the audience that no prayer will be delivered before the board member got up and gave his remarks. So that's a situation where I can't see a reasonable. But why is that required? Isn't the whole problem with reconciling the establishment clause and the free exercise clause is that there's supposed to be neutrality. You're neither supposed to advance nor inhibit. Yes. In the case of even selecting the students based on GPA or academic status, the courts have recognized that when the school selects the speakers on those basis, it's still not a neutral application because a student in the audience hearing the message. Because really what the Lemon Test is focusing on is the reasonable observer. And for a student in that audience, especially a fifth grader, listening to that prayer would understand, even if the student selected on neutral criteria such as GPA, that the school selected that student as a representative of the school, as someone that is an example of what the school stands for because of the GPA. In Lassonde, the Ninth Circuit found that as well as the Tenth Circuit in the court case. Would it be enough that the school policy was that at the beginning of the program there would be a disclaimer? No, Your Honor. In Blackhorse and Harris. How about a lottery? A lottery? Mm-hmm. Draw a name out of a hat. It doesn't, A, solve the lack of secular purpose and, B, the coercion element. Nothing will satisfy, you don't think anything satisfies the position other than a prohibition, a flat prohibition. That's why I asked you that. Yes. Your argument comes back to that. It does except for the case of Norfolk situation because. No, but there was a prohibition in that case. You're right. That's right. Yes. Really? Yes. I want to listen to you arguing what Judge Duncan is asking. No, I think. As you come back, you think the school policy to be constitutional has to prohibit school prayer. Whether it's written or not, yes. Because the effect of a prayer. Whether it's written or anything. Yes. You think the school policy has to prohibit school prayer to be constitutional. Yes, and I think Lee supports that conclusion because at the end of the day, Lee was focused on the effect of the prayer that's delivered. Lee didn't have a formal policy either. And Santa Fe even said that even if the policy were facially neutral, it would still be problematic because of the effect that it would have and the fact that the school could not insulate itself from the coercion component of the prayer itself. And there's the evidentiary issue I wanted to raise as well. The plaintiffs had a very difficult time getting any evidence of the 2014, 2013, and 2012 graduation programs. The district refused to give any evidence of any of them. And it took a motion to compel to reach an agreement to get a mere sample of the evidence. So when my opposing counsel says that there is only three prayers of 2014 graduations, well, the plaintiffs only asked specifically about three 2014 graduation prayers. And the defendant actually denied that a prayer was delivered at the Blue Ridge High School. Let me say this. Yes. If this is a production of evidence, you know what to do. You say move to compel. Ask the judge for sanctions for more information. We did move to compel, Your Honor. I'm saying so. I don't know what you're talking about to us now. You've got the record established. Did the district court not give you enough discovery? Our position is that we weren't operating under... Did you appeal that? I don't understand. What are you arguing this right now? My point is that the sample is just that, a sample. It wasn't intended to be a comprehensive, this is all the 2014 programs. So if we had that full evidence, which was the case in Adler that the court relied on, which was a full survey of all the schools, then we would have a better place to say there's only three prayers delivered. But we don't have that, so I don't think it's a fair representation. We have to go and watch in the record. Watch in the record is all we can do. That's right. And it's a sample. That's all I'm trying to say, is it's a mere sample of evidence. It's not conclusive evidence. And I think we just need to be careful of... I don't know what you mean by that. It's conclusive for us that that's all the evidence we have in the record. Only about 40 schools were sampled, and the vast majority of those were elementary schools. And we were encouraged to narrow our request. So I think, I mean, we didn't see that as a problem because the courts have not, the only court to use a ratio... Just let me say this. You've gone over your time. Let me give you 30 seconds to wrap up the argument if you want to do that. We've asked you a lot of questions. Let me give you 30 seconds just to make your argument for us one final time. Okay. The problem with this practice is that it, at the very least, lacks a secular purpose because the Supreme Court has said you can't turn a blind eye to the context and the history of a practice. And when the school is only offering two minor modifications to a longstanding prayer practice, we should look at that with a critical eye and discern whether there is, in fact, a secular purpose. And that is true regardless of the possible applications. Two is the coercion problem. Even if the school is able to divorce itself from the content of the message, a reasonable observer, and especially a reasonable fifth grader, is very likely to feel coerced and pressured into participating with all that it implies or protesting or, worse, foregoing attendance at the graduation ceremony to avoid this conundrum. For those two reasons, we ask that the court reverse the judgment of the district court. Okay. Thank you very much. Thank you. We'll have the clerk adjourn the court and we'll step down to great counsel. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Dennis W. Shedd, Allyson K. Duncan, Barbara Milano Keenan